JUDGE SWAIN

11 CV 3533

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



CENTER FOR CONSTITUTIONAL
RIGHTS, INC.,

        Plaintiff,

        v.

DEPARTMENT OF DEFENSE;  CENTRAL
COMMAND; COAST GUARD;
DEPARTMENT OF NAVY; EUROPEAN
COMMAND; DEPARTMENT OF
HOMELAND SECURITY; DEPARTMENT
OF JUSTICE; AND
DEPARTMENT OF STATE,

        Defendants.

Civil Action Docket No.

ECF Case

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## PRELIMINARY STATEMENT

1.    This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, for declaratory, injunctive and other appropriate relief, and seeking the immediate processing and release of agency records requested by the plaintiff, Center for Constitutional Rights, on June 30, 2010 ("Requests") from defendants, Central Command ("USCENTCOM"), Coast Guard, Department of Defense ("DOD"), Department of Homeland Security ("DHS"), Department of Justice ("DOJ"), and Department of State ("DOS"), and the European Command ("USEUCOM"), and their components (collectively, "Defendants").

2.    Plaintiff seeks the release of records on a matter of significant public concern: the Israeli attack that occurred on May 31, 2010 in international waters in the Mediterranean Sea against a six-boat humanitarian flotilla headed to Gaza with more than 700 civilian passengers ("Flotilla"). The Flotilla, which included the U.S.-registered *Challenger I* and the Comoros-registered *Mavi*

1.

*Marmara*, was forcibly intercepted by the Israel Defense Forces ("IDF"). The *Mavi Marmara* was forcibly boarded by Israeli commandos, resulting in the death of nine civilians during the operation, including one U.S. citizen, 18-year old Furkan Doğan.

3.      Nearly eleven months have elapsed since Plaintiff filed the FOIA Requests, and only two agencies released any responsive records and, as detailed below, even these two responses, were wholly inadequate.

4.      There is substantial public interest in the attack on the Flotilla. The records Plaintiff seeks are urgently needed *inter alia* to inform the public about what actions, if any, the United States undertakes to ensure that U.S. citizens (including citizens participating in humanitarian missions and expressing their views through lawful, non-violent means) and U.S.-registered vessels are not subject to attack by a foreign military, and in the event that they are, what steps the U.S. will take to safe-guard U.S. citizens and property, and ensure full investigation into, and accountability for, harm done to them.

5.      This issue offers important insight into the practices of the U.S. in protecting its citizens and U.S. registered vessels in the future. Citizens planning to travel on the next flotilla in June 2011 have the right to know what protections they can expect their government to provide.

6.      Property of U.S. citizens was seized during the raid. As Israel continues to retain control of this property, the public has a need to know what the DOS and/or DOJ, among other agencies, has done *inter alia* to safeguard evidence and assist the U.S. passengers in retrieving their personal property. Of particular concern are communications regarding the preservation of evidence related to the death of Furkan Doğan, and the steps that the DOS, DOJ and other agencies have taken to ensure that his death be properly and independently investigated. The United Nations Fact-Finding Mission concluded that the refusal of Israel to return this personal

property is, "a deliberate attempt by the Israeli authorities to suppress or destroy evidence and other information related to the events of 31 May,"[1] in part because a significant portion of the property being held is electronics including a video camera, which had recorded the operation.

7.      Finally, there is a substantial public interest in knowing the U.S. government's policies and practices when it comes to allowing humanitarian aid to be delivered to the people of Gaza, who have been living under a blockade for nearly five years, and to the blockade generally.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 552(a)(6)(E)(iii). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

9.      Plaintiff Center for Constitutional Rights ("CCR") is a New York-based not-for-profit legal and public education organization that engages in litigation, legal research, and the production of publications in the field of civil rights, domestic and international human rights. CCR publishes regular newsletters, know-your-rights handbooks, and other informational materials for public dissemination.    The materials are also available through CCR's

---

[1] U.N. Human Rights Council, *Report of the international fact-finding mission to investigate violations of international law, including international humanitarian and human rights law, resulting from the Israeli attacks on the flotilla of ships carrying humanitarian assistance, pg 30, Delivered to the General Assembly,* U.N. Doc. A/HRC/15/21, Sept. 22, 2010, ("UN HRC Flotilla Report"), at 50, available at: http://www2.ohchr.org/english/bodies/hrcouncil/docs/15session/A.HRC.15.21_en.pdf. The United Nations Fact-Finding Mission was established by the United Nations Human Rights Council on June 2, 2010, pursuant to A/HRC/14/1, and its mandate was interpreted by its members to be to investigate the facts and circumstances regarding the boarding by the Israeli military personnel of the Flotilla and to determine whether in the process violations occurred of international law. The UN HRC Flotilla Report is the result of the testimonies of more than 100 witnesses and documentary evidence.

Development, Communications, and Education and Outreach Departments. CCR operates a website, www.ccrjustice.org, that addresses the issues on which CCR works.  The website includes material on topical civil and human rights issues and material concerning CCR's work. In addition, CCR maintains a case-page on its website dedicated to the Flotilla and the CCR's FOIA requests, www.ccrjustice.org/gaza-flotilla.  The case-page serves as a resource for the public and particularly for individuals who were on the Flotilla or who may be considering participation in a future flotilla, and is a mechanism to disseminate information disclosed pursuant to FOIA.  All of this material is free to the public.  The office and principle place of business of CCR is located in New York County, New York.

10.     Defendant United States Department of Defense is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

11.     Defendants United States Navy, United States Central Command, United States Coast Guard and its internal offices, United States European Command, are component offices of the DOD and are all agencies within the meaning of 5 U.S.C. 552(f)(1).

12.     Defendant United States Department of Homeland Security is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

13.     Defendants, the Office of Intelligence and Analysis, the Science and Technology Directorate, the Executive Secretariat, and the Office of Policy, are component offices of DHS and are all agencies within the meaning of 5 U.S.C. 552(f)(1).

14.     Defendant United States Department of Justice is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

15.    Defendant United States Department of State is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## STATEMENT OF FACTS

16.    Since 2006, Israel has imposed a blockade on Gaza, isolating it economically and politically by closing or restricting border access for people and goods (including food supplies), entering or leaving.[2] The blockade from the sea went into effect three nautical miles from the Gaza coastline.[3]  By May 2010, the blockade had led to malnutrition and starvation, a crumbling and over-burdened health care system, environmental harms caused by pollution due to heavy damage to the water and sanitation facilities, lack of schools and supplies to maintain a functioning education system and a lack of supplies needed to rebuild destroyed homes.[4]

17.    At approximately 4:00 am on May 31, 2010, a six-boat flotilla carrying more than 700 civilians (including journalists) on a humanitarian mission in response to the Israeli blockade was forcibly overtaken by commandos from the Israel Defense Forces in international waters en

[2] The "blockade" was discussed, and its scope and effect outlined, in the Goldstone Commission Report: "The blockade comprises measures such as restrictions on the goods that can be imported into Gaza and the closure of border crossings for people, goods and services, sometimes for days, including cuts on the provision of fuel and electricity. ...In addition to creating an emergency situation, the blockade significantly weakened the capacities of the population and of the health, water and other public sectors to react to the emergency created by the military operations." Human Rights in Palestine and Other Occupied Arab Territories, Report of the United Nations Fact Finding Mission on the Gaza Conflict, A/HRC/12/48, Sept. 15, 2009, ¶ 27 ("Goldstone Commission Report").
[3] *See* UNRWA Emergency Appeal Progress Report January-June 2009, p. 3, *available at*: http://www.unrwa.org/userfiles/2010041825349.pdf.  Under the Oslo Accords, the Palestinian fishing zone extended to 20 nautical miles.
[4] For a discussion of the impact of the blockade on Palestinians living in Gaza in May 2010, *see, e.g.*, www.unrwa.org; http://www.who.int/hac/crises/international/wbgs/en/ (WHO reports and statements on the occupied Palestinian territory). *See also Gaza closure: not another year!* International Committee of the Red Cross, June 14, 2010, News Release 10/103 available at: http://www.icrc.org/web/eng/siteeng0.nsf/html/palestine-update-140610 (reporting on "all-time low" of medical supplies, including essential medicines, and the effects of electricity cuts on heath care, including power outages during surgery); Report of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Richard Falk, A/HRC/13/53/Rev.1, June 7, 2010, ¶¶ 30-34. *See also* Goldstone Commission Report, ¶ 65 ("Insufficient supply of fuel for electricity generation had a negative impact on industrial activity, on the operation of hospitals, on water supply to households and on sewage treatment. Import restrictions and the ban on all exports from Gaza affected the industrial sector and agricultural production. Unemployment levels and the percentage of the population living in poverty and deep poverty were rising.").

route to Gaza. Nine individuals were killed and many more were wounded when commandos rappelled onto the upper deck of the largest ship in the Flotilla, the Comoros-flagged passenger ferry, the *Mavi Marmara*. *See, e.g.,* UN HRC Flotilla Report.

18.     Among those killed in the attack was Furkan Doğan, an 18-year-old U.S. citizen who was traveling aboard the *Mavi Marmara*. According to an international fact-finding mission commissioned by the United Nations Human Rights Council, Furkan Doğan was shot five times, including twice in the head, once in the back, once in the left leg and once in the foot. All of the entry wounds were to the back of his body, except the shot to his face, which was delivered at point-blank range. *See* UN HRC Flotilla Report, p. 29. Information surrounding the circumstances of his death, and actions taken by the U.S. government following his death, is of great importance to the Doğan family and of substantial interest to the American public, as are the circumstances of the deaths of the eight other civilians killed aboard the *Mavi Marmara*.

19.     Furkan Doğan was among sixteen U.S. citizens who were part of the Flotilla, including five who were on the *Challenger I*, a U.S.-registered vessel, which continues to be held by Israel.

20.     After being boarded by the Israeli military, the six ships and their passengers were forcefully rerouted to the Israeli port of Ashdod, where the majority of the passengers were detained without charge, before being deported from Israel. There were reports of passengers being mistreated or abused during the seizure of the boats and while in detention, and their personal belongings were confiscated. *See* UN HRC Flotilla Report, at p. 31, ¶¶ 133-134 (for description of treatment of passengers aboard the *Mavi Marmara*, including passengers being kicked, punched or hit with rifle butts; subjected to verbal abuse; threatened or bitten by military dogs; and denied or delayed access to toilet facilities); p. 41-42 (discussing processing procedures in Ashdod and detention conditions).

21.     U.S. passengers sought assistance from the U.S. to retrieve their property seized by Israel. *See, e.g.,* A. Wright, *"Secretary of State Clinton: Now That the Wedding is Over, Could you Respond to Requests from American Citizens on the Gaza Flotilla?"* Common Dreams, Aug. 5, 2010, *available at*: http://www.commondreams.org/view/2010/08/05-6. Israel continues to hold most of the personal property seized from the passengers, including property of evidentiary value such as cameras, video equipment, cell phones and computers, as well as the U.S.-registered ship, *Challenger I.*

22.     Another humanitarian aid flotilla to Gaza is planned for June 2011. Again, U.S. citizens and vessels will take part in the humanitarian relief efforts. *See* US to Gaza website: http://ustogaza.org/. *See also* R. Mackey, *"American Activists Plan Gaza Flotilla Ship Named for Obama Book,"* N.Y.TIMES, July 20, 2010, *available at*: http://thelede.blogs.nytimes. com/2010/07/20/american-activists-plan-gaza-flotilla-ship-named-for-obama-book/?scp=2&sq= flotilla%20gaza%20israel%20united%20states&st=cse.

23.     The attack on the Flotilla, and the response of the U.S. government thereto, is of substantial public interest. *See, e.g., "Deaths as Israeli forces storm Gaza aid ship,"* BBC News, May 31, 2010, *available at*: http://news.bbc.co.uk/2/hi/middle_east/10195838.stm; J. Zacharia, *"Israeli troops raid aid flotilla headed for Gaza, killing nine"* WASHINGTON POST, June 1, 2010, *available at*: www.washingtonpost.com/wp-dyn/content/article/2010/05/31/AR2010053101209. html; *"Security Council Condemns Acts Resulting in Civilian Deaths During Israeli Operation,"* Security Council, SC/9940, May 31, 2010, *available at*: http://www.un.org/News/Press/ docs/2010/sc9940.doc.htm; M. Lander, *"After Flotilla Raid, U.S. Is Torn Between Allies,"* N.Y.TIMES, June 1, 2010, *available at*: http://www.nytimes.com/2010/06/02/world/middleeast/ 02policy.html?scp=17&sq=flotilla%20gaza%20israel%20united%20states&st=cse; R. Mackey,

"*Three American Subplots in Flotilla Drama*," N.Y. TIMES, June 3, 2010, *available at*: http://thelede.blogs.nytimes.com/2010/06/03/three-american-subplots-in-flotilla-drama/?scp=18 &sq=flotilla%20gaza%20israel%20united%20states&st=cse; R. Cohen, "*The Forgotten American*," N.Y. TIMES, July 26, 2010, *available at*: http://www.nytimes.com/2010 /07/27/ opinion/27iht-edcohen.html?scp=1&sq=flotilla%20gaza%20israel%20united%20states%20roger %20cohen&st=cse; N. Mozgovaya, "*Father of teen killed in Gaza flotilla raid seeks American justice*," HAARETZ, Feb. 25, 2011, *available at*: http://coto2.wordpress.com/2011/ 02/25/father-of-teen-killed-in-gaza-flotilla-raid-seeks-american-justice/; "*Gaza flotilla attack: US to investigate death of citizen*," THE GUARDIAN, June 3, 2010, *available at*: http://www.telegraph.co.uk/news/worldnews/middleeast/palestinianauthority/7801935/Gaza-flotilla-attack-US-to-investigate-death-of-citizen.html; P. Weiss, "*State Department H.R. Report doesn't mention killing of Dogan, and exaggerates two 'deaths.'*" Mondoweiss, April 11, 2011, *available at*: http://mondoweiss.net/2011/04/state-department-h-r-report-doesnt-mention-killing-of-dogan-and-exaggerates-two-deaths.html. *See also* YouTube video, "*Israeli Attack on Mavi Marmara: Raw Footage*," Cultures of Resistance, *available at*: http://www.youtube.com/watch?v=vwsMJmvS0AY (328, 636 views as of May 19, 2011).

24.     The reasons for this public interest are numerous, including the fact that the attack on the Flotilla caused serious harm to civilians, including U.S. citizens, as well as the confiscation of their property. Information sought through these FOIA requests is relevant to the wider American public as well as citizens who will engage in future flotillas.

25.     There is substantial public interest in knowing what protections were provided to U.S. citizens, and what protections will be afforded them in the future. The requested information will inform the public about: what steps, if any, the U.S. took to ensure that force would not be used

by the Israeli government against a humanitarian flotilla; what actions, if any, the U.S. took to protect its citizens (and other civilians) before the attack; what it knew about the on-going attack; and what actions it took to secure the safety and return of U.S. citizens and property after they were seized by Israel.

## THE FOIA REQUESTS

26.     In the interest of promoting government transparency for the American public and in the hope that such transparency may help to avert a similar tragedy for future flotillas, CCR submitted the Requests to Defendants on June 30, 2010. They seek records related to the knowledge of, conduct by, and responses of the U.S. government to the May 2010 Flotilla operation.

27.     Plaintiff seeks *inter alia* all records, regardless of format, medium, or physical characteristics, including electronic records and information, audiotapes, videotapes and photographs, that reflect, relate or refer to the May 31, 2010 Israeli military operation in international waters involving the Flotilla headed to Gaza with humanitarian supplies, including the U.S.-registered *Challenger I*, which the Israeli forces forcefully intercepted.

28.     More specifically, Plaintiff seeks from all departments and agencies discussed below:

(1) any and all records since January 1, 2010 that mention, refer or relate to any vessels or a flotilla of boats destined for Gaza in May 2010, including the U.S.-flagged *Challenger I*, including but is not limited to records reflecting communications with inter-governmental organizations, such as the North Atlantic Treaty Organization (NATO), foreign governments or between US agencies or departments which relate to possible, planned, or executed actions by the U.S. government in the Mediterranean Sea in response to Israel's military operations at sea;

(2) any and all records reflecting communications with any member-state of NATO, including Turkey, prior to, on, or after May 31, 2010 in relation to the U.S.-registered *Challenger I* or any other vessel which formed part of the Flotilla of ships headed towards Gaza in May 2010, including communications regarding any requests, notices or indications from the Israeli government of its intentions to block, board or otherwise redirect the U.S.-registered vessel to a destination other than its intended destination of Gaza, and any responses to such information;

(3) any and all records reflecting communications with the any division or representative of the government of Israel, including the Israel Defense Forces ("IDF") prior to, on, or after May 31, 2010 in relation to the U.S.-registered *Challenger I* or any other vessel in the Flotilla, including any requests, notices or indications from the Israeli government of its intentions to block, board or otherwise redirect the U.S.-registered vessel or any other vessel to a destination other than their intended destination of Gaza, and any responses thereto;

(4) any and all records reflecting communications with any division or representative of Israel, including the IDF, on or after May 31, 2010, in relation to the actions that occurred on board each of the six boats of the flotilla, including the U.S.-registered *"Challenger I,"* including the status of U.S. and non-U.S. passengers, while on board the vessels or in Israel, including in detention or medical facilities or other facilities, following the interception of the Flotilla by Israel;

(5) any and all records reflecting communications in any format with any division or representative of Israel, including the IDF, on or after May 31, 2010 in relation to whereabouts, condition and status of the U.S.- registered *Challenger I*, and the other vessels that were in the Flotilla, including the property on board each vessel or belonging to the

passengers on board each vessel, and the return of the *Challenger I* and each of the other vessels;

(6) any and all records reflecting communications, including the transmission or exchange of instructions, guidelines, policy statements or standard operation procedures  any division or representative of Israel, including the IDF, on or after May 31, 2010 in relation to the preservation and safeguarding of possible evidence or materials in the possession of Israel from, related to or relevant to the incident, including computers, cameras, cell phones, SIM cards, personal devices, computer disks or memory chips, hard drives or other such devices, so as to ensure that evidence has not been destroyed, tampered with, altered or otherwise rendered suspect or unusable in any and all subsequent investigatory proceedings; and

(7) any and all records since at least June 1, 2007 that relate to U.S. actions, policies, procedures or guidelines in relation to interception, inspection, safe-passage or any other action or response to vessels in the Mediterranean Sea that have as their destination Gaza, including but not limited to vessels undertaking humanitarian missions in response to the Israeli blockade of Gaza.

29.    Plaintiff sought expedited processing of the Requests, submitting that there is an "urgent need" to inform the public about government policies, actions and instructions about "preparation, participation or reaction to attacks on U.S.- registered boats in international waters, to vessels with U.S. citizens onboard, or to vessels with civilians that encounter an armed attack, including but not limited to civilians transporting humanitarian supplies," and that U.S. citizens and U.S.- registered vessels had an "urgent" need to know "the support, protection, reactions and any actions or inactions they can expect from the United States government in the event that they are subject to attack, detention or deportation." CCR also cited the various international

investigations that were planned as a reason that the public need to be informed urgently "of the policies, procedures, requests, demands or any other responses, actions or inactions, the United States has made to the government of Israel to safeguard evidence gathered in relation to the May 31, 2010 attack on the Flotilla, including but not limited to the preservation of property in its original form seized by the government of Israel," particularly in light of the fact that a U.S. citizen was killed during the Israeli raid on the *Mavi Marmara*. As emphasized in Plaintiff's appeal letters, because U.S. citizens are planning to participate in future missions to Gaza, there is an urgent and compelling need to receive answers to the Requests.

30.    Plaintiff also requested a fee waiver. This request was made on the basis that CCR qualifies as a "representative[] of the news media" and the requested records are not sought for commercial use, and on the grounds that disclosure of the requested records is in the public interest and because disclosure "is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii). In the Requests, Plaintiff submitted that the

> "public has an interest in knowing about the manner in which the federal government prepared for, and responded to, information regarding a possible attack on the flotilla destined for Gaza in May 2010; [...] what steps the United States took, and continues to take, in securing the rights and protections of U.S. citizens, their property and potential evidence vis-à-vis a foreign military, and what steps the United States took to ensure that civilians of all nationalities engaged in stated humanitarian missions are protected from attack, in accordance with domestic policies and laws, and international humanitarian law; [and] what the United States policy was, and is, in relation to the blockade of Gaza, including in relation to the list of prohibited goods including but not limited to spices, toys and candy that do not have a military purpose, and the delivery of humanitarian assistance to the civilian population of Gaza."

31.    In the alternative, Plaintiff requested a limitation of the processing fees.

32.    None of the Defendants timely responded to Plaintiff's Requests.

33.    Since filing the Requests, Plaintiff has spent significant time and effort attempting to obtain responsive documents from Defendants without resorting to litigation.   These efforts included written correspondence and numerous telephone calls with certain Defendants and their components, as well as filing administrative appeals with agencies that apparently determined they would not provide Plaintiff with documents responsive to the Requests.   As is detailed below, Plaintiff presented evidence of the likelihood of Defendants having responsive records in the appeal letters, as Plaintiff cited statements from agency officials related to the Flotilla, specified aspects of agencies mandates that directly related to the Flotilla, and otherwise drew a direct link between the Flotilla and each of the Defendants.   These efforts have been to no avail.

34.    Defendants' responses are detailed as follows.

### Department of Defense

35.    On June 30, 2010, CCR submitted, via first-class mail, a written FOIA request to the Department of Defense. ("DOD FOIA Request").[5]

36.    In a letter dated July 19, 2010, the Department of Defense issued an interim response denying CCR's requests for a fee waiver, limitation of fees, and expedited processing.  The DOD designated CCR as an "other" fee category requester, which allowed CCR two hours of search time and 100 pages of duplication free of charge. The DOD stated that it would be unable to make a release determination on CCR's request within the 20-day statutory time period on the basis of three enumerated "unusual circumstances which impact our ability to quickly process [CCR's] request." *See* DOD Interim Response, p.4. CCR's request was placed in a queue of 1,730 open requests to be reviewed in the order in which they were received.

---

[5] All FOIA correspondence cited herein is available at: www.ccrjustice.org/gaza-flotilla

37.   CCR made a timely appeal, on September 17, 2010, to the DOD's denials of CCR's requests, including the denial of fee waiver and the denial of expedited processing. ("DOD First Appeal").

38.   In the DOD First Appeal, CCR challenged the DOD assertion that it would not "primarily" be expected to hold records receptive to the Request, setting forth reasons why the Office of the Secretary of Defense ("OSD") and the Joint Staff ("JS") would reasonably be expected to have responsive records. CCR demonstrated that the mandates, structure, mission and focus of both the OSD and the JS, including because Israel is the "largest cumulative recipient of U.S. foreign assistance since World War II," and that "[a]lmost all U.S. bilateral aid to Israel is in the form of military assistance," and as such, "the DOD and the offices enumerated in the OSD would have significant interests in U.S. policies towards Israel, including its blockade of Gaza." DOD First Appeal, pp. 2-3 (internal citations omitted).

39.   CCR also cited the Memorandum of Understanding ("MOU") between the U.S. and Israel, which recognizes "the threat to Israel of hostile and terrorist activity from Gaza, including weapons smuggling and the build-up of terrorist capabilities, weapons and infrastructure," and agrees that both countries would participate in "enhanced intelligence fusion with key international and coalition naval forces and other appropriate entities to address weapons supply to Gaza." *Memorandum of Understanding*, reprinted in HAARETZ, Jan. 16, 2009, *available at*: http://www.haaretz.com/news/text-of-u-s-israel-agreement-to-end-gaza-arms-smuggling-1.268308. *See also United States, Israel Working to End Arms Smuggling into Gaza*, Jan. 16, 2009, *available at*: http://www.america.gov/st/peacesec-english/2009/January/20090116141010 dmslahrellek0.0438959.html. The MOU also calls for "enhanced sharing of information and intelligence that would assist in identifying the origin and routing of weapons being supplied to

terrorist organizations in Gaza." The MOU necessarily encompasses the OSD whose responsibilities include, but are not limited to: "initiate programs, actions, and taskings to ensure adherence to DOD policies and national security objectives, and to ensure that programs are designed to accommodate operational requirements." OSD website: http://odam.defense.gov/omp/pubs/GuideBook/osd.htm.

40.      Additionally, CCR identified that the Secretary of Defense, Robert Gates, has confirmed the close relationship between Israel and the United States and personally discussed "important defense issues, both in our bilateral defense relationship and around the region" with the Israeli Defense Minister about one month before the attack on the flotilla. *See* DOD First Appeal, pp. 3-4; *Press Conference with Secretary Gates and Israeli Defense Minister Barak*, Council on Foreign Relations, April 27, 2010, *available at*: http://www.cfr.org/israel/press-conference-secretary-gates-israeli-defense-minister-barak-april-2010/p22004. After the attack, Secretary Gates presented his views on the utility and purposes of the blockade of Gaza. *See Israel eases Gaza embargo, allows snack food in*, REUTERS, June 9, 2010, *available at*: http://www.alertnet.org/thenews/newsdesk/LDE6581JK.htm. He further spoke about the Middle East peace process and the central role that the current situation in Gaza plays in that regard. *See Robert Gates interview: US secretary of defence talks about Iran's nuclear programme and economic sanctions with David Frost*, AL JAZEERA, June 10, 2010, *available at*: http://english.aljazeera.net/programmes/frostovertheworld/2010/06/201061091243602584.html. Secretary Gates also spoke with concern about the deterioration of the relationship between Turkey and Israel following the attack on the Flotilla. *See* Adam Entous, *U.S. concerned at Turkey shift: Gates*, REUTERS, June 9, 2010, *available at*: http://www.reuters.com/article/idUSTRE65811220100609.

41.    Finally, CCR demonstrated that the JS would be likely to have responsive records because the "Joint Chiefs of Staff has demonstrated his knowledge of, and involvement in, formulating an U.S. response to the blockade and the attack through discussions and joint projects between his office and Israeli counterpoints; news stories of a meeting held between the Joint Chiefs of Staff with Israeli officials about Israeli naval operations report that they "discussed ways to communicate a strategic message to the world, that Israel is not making this stuff up, that aid flotillas can end up becoming weapons flotillas." *See* DOD First Appeal, p.4.

42.    In a letter dated November 5, 2010, the DOD acknowledged receipt of CCR's timely appeal and notified CCR that the DOD would be unable to complete CCR's appeal within the statutory time requirement due to an "extremely heavy workload."

43.    In a letter dated December 23, 2010 ("DOD Final Response"), DOD notified CCR that an Initial Denial Authority of the Joint Staff conducted a two-hour search yielding four responsive documents.  The DOD denied release of one document in its entirety pursuant to 5 U.S.C. §§ 552(b)(1) (classified national security information), (b)(2) (agency internal personnel rules and practices), and (b)(5) (inter-agency or intra-agency memoranda), and referred the remaining three documents to the Defense Intelligence Agency (DIA), the Department of State (DOS), and the National Geospatial-Intelligence Agency (NGA) for review. As no response had been received from DIA, DOS or NGA in relation to the three documents, CCR contacted each via telephone on March 4, 2011: DOS stated that one document was still pending review of assignment; NGA never responded to voicemail messages left by CCR; and DIA, following a follow-up phone call on March 11, 2011, indicated that the one document it had received is still under review.

44.    On March 14, 2011, CCR appealed the DOD Final Response ("DOD Second Appeal"): it appealed the adequacy of the search undertaken by the DOD and the withholding of one document pursuant to 5 U.S.C. §§ 552(b)(1), (b)(2), and (b)(5); and reiterated their appeal of denials to CCR's requests for a fee waiver, limitation of fees, and expedited processing.

45.    The statutory deadline for deciding the appeal has passed: the DOD has not responded to the DOD Second Appeal.

46.    As of the date of this pleading, none of the responsive documents have been produced in whole or in part. CCR has not received any communications from the DIA, DOS, and NGA in relation to the three responsive documents.

### Central Command

47.    On June 30, 2010, CCR submitted, via first-class mail and e-mail, a written FOIA request to the United States Central Command. ("Central Command FOIA").

48.    In an email dated July 12, 2010, USCENTCOM acknowledged receipt of the Central Command FOIA, and notified CCR that USCENTOM would be administratively closing CCR's request on grounds that "USCENTCOM has no equities of the request and that this falls under EUCOM's purview." USCENTCOM referred CCR to EUCOM for follow-up, and notified CCR of its right to appeal.

49.    CCR submitted a timely appeal on September 9, 2010 to USCENTCOM's determination that there is no affiliation between the information CCR seeks and the activities of Central Command, and requested that Central Command conduct an adequate and reasonable search for the documents requested. ("Central Command Appeal"). CCR submitted that its Request "falls squarely under the purview of the Central Command," which is mandated to "promote[] cooperation among nations, responds to crises, and deter[] or defeat[] state and nonstate aggression" in an area of responsibility that includes Egypt: "CENTCOM continues to work

17.

*closely* with the Egyptian security forces to interdict illicit arms shipments to extremists in Gaza and to prevent the spread of Gaza's instability into Egypt and beyond." http://www.centcom.mil/en/egypt/. In March 2010, then-CENTCOM Commander, David Petraeus, remarked in his testimony before the Senate Armed Services Committee on the "distinct challenges to our ability to advance our interests in the [Area of Responsibility]" caused by insufficient progress towards a comprehensive Middle East peace that addresses "the Palestinian question." *Statement of General David H. Petraeus, U.S. Army Commander, U.S. Central Command, before the Senate Armed Services Committee on The Posture of U.S. Central Command,* Mar. 16, 2010, p.12, *available at:* http://armed-services.senate.gov/statemnt/2010/03%20March/Petraeus%2003-16-10.pdf.

50.     CCR further stated that "it is apparent that the Central Command is involved with *inter alia* matters of the blockade against Gaza, with policies related to border-control between Egypt and Gaza, with the interdiction of arms shipments into Gaza, with the current situation in Gaza, with "the Palestinian question," and is monitoring, if not more actively involved in, matters related to the Middle East peace process related to the Israeli-Palestinian conflict," and therefore reasonable to conclude that Central Command has responsive documents. *See* Central Command Appeal, pp. 2-3.

51.     In a letter dated December 8, 2010 from the Chief of the DOD FOIA Policy Office, CCR was notified that USCENTCOM conducted "another search" for records and located "additional records" that may be responsive to CCR's request. The Request was remanded to Central Command "reopen" the initial request and to make a "releasability determination regarding the newly located documents."

52.     The statutory deadline for the review of the FOIA request has passed, and CCR has received <u>no response</u> (or documents) from USCENTCOM, including even a response advising CCR that additional time is required for this Request.

### Coast Guard

53.     On June 30, 2010, CCR transmitted a written FOIA request via first-class mail and email to the U.S. Coast Guard. ("Coast Guard FOIA").

54.     On July 19, 2010, the U.S. Coast Guard FOIA and Data Administration Division sent a "final response," in which it stated that it had conducted a comprehensive search, using specific search terms, that yielded no results.

55.     On September 13, 2010, CCR filed a timely appeal challenging the adequacy of the search. CCR asserted that "in light of the request for information about a U.S.-registered vessel in international waters, about the fate of U.S. passengers in an area where the United States has a presence and a policy, and taking into account the Coast Guard's mission includes the registration of vessels, defense readiness and law enforcement, that it has participated in international missions, and is integrated with Department of Defense planning and operations," it is reasonable to conclude that the Coast Guard could have responsive documents. CCR identified the following subdivisions as likely having responsive documents: Intelligence and Criminal Investigations; Office of International Affairs and Foreign Policy; Office of Law Enforcement; Office of Counterterrorism & Defense Operations, including the National Defense Strategy Division (GC-5321); Prevention Policy Directorate (CG-54); and the National Vessel Documentation Center.

56.    On November 15, 2010, the Coast Guard informed CCR that it had forwarded the Request to the FOIA Coordinator of the Assistant Commandant for Marine, Safety, Security, and Stewardship "for a subsequent/additional search" for responsive records.

57.    On December 3, 2010, the Coast Guard responded to the Appeal, informing CCR that the Coast Guard FOIA had been forwarded to the Office of Investigation and Casualty Analysis, Office of Law Enforcement, Office of Counterterrorism and Defense Operations, Office of Auxiliary and Boating Safety and the Office of the Director of International Affairs and Foreign Policy, which would respond directly to CCR.

58.    In December 2010, the following Coast Guard sub-component offices responded that they did not have responsive records: the Office of Auxiliary and Boating Safety, the Office of Counterterrorism and Defense Operations, the Office of Law Enforcement, and the Office of International Affairs. [6]   CCR also received a response from the FOIA and Data Administration Division on December 9, 2010, stating that its searches did not yield any responsive records.

59.    Plaintiff did not receive an answer from the following offices it, or the Coast Guard, had previously identified as possibly having responsive documents: Office of Investigation and Casualty Analysis, and the Intelligence and Criminal Investigations, the Office of International Affairs and Foreign Policy and the National Vessel Documentation Center.

60.    On April 1, 2011, CCR filed a global appeal letter with the Coast Guard, in which it challenged the adequacy of the searches conducted by those sub-components which have responded and the determination by the Coast Guard that it does not have any responsive records to the Coast Guard FOIA.

---

[6] For more detailed reasoning, see, e.g., the Office of Auxiliary and Boating Safety response (submitting that the Request addresses "subjects [that] are outside the Office's purview," and that "the Office does not have records relating to communication with Israel Defense Forces, the involvement of the Challenger I in the described events, or guidance for vessels transiting in the Mediterranean Sea."

61.     In a letter dated April 14, 2011, the Coast Guard informed CCR that it had remanded the Coast Guard FOIA to the Office of Investigations and Casualty Analysis, stating that responsive documents had been located within the Marine Information for Safety and Law Enforcement database. The Coast Guard FOIA was also forwarded to the Fifth Coast Guard District ("CGD FIVE") for a subsequent search "because the subject vessels CHALLENGER I, CHALLENGER II, and CHALLENGER III are registered within the state of Delaware and within CGD FIVE's area of responsibility."

62.     CCR followed up on the referral of the Coast Guard FOIA by telephone with Office of Investigations and Casualty Analysis and CGD FIVE on April 26 and April 27. On May 4, 2011, CCR received a response dated April 27, 2011 from the Data Administration Division which included documents apparently located within the Office of Office of Investigations and Casualty Analysis and determined appropriate for public release. On May 11, 2011, CCR submitted a letter seeking clarification of the nature of the response, and indicated that if this were to be considered a final response, it would be filing an appeal challenging the adequacy of the search and the redaction of information without any reference to FOIA exemptions.

63.     In a letter dated May 13, 2011, CGD FIVE responded to the Request, stating that it would need an additional 10 days to process the Request.

64.     As of the date of the filing, CCR has still not received documents from CGD FIVE, nor has it received a response from the Data Administration Division to its May 11, 2011 letter seeking clarification. Finally, CCR has not received a response from any of the other subcomponents to which its April 1, 2011 appeal was directed.

### European Command

65.     On June 30, 2010, CCR submitted, via certified mail and e-mail, a written FOIA request to the United States European Command. ("European Command FOIA").

66.     In a letter dated July 16, 2010, the USEUCOM issued an interim response, in which it denied CCR's request for expedited processing; postponed deciding on fee waiver eligibility until a search for responsive documents is conducted; and recommended that, in the event the fee waiver is denied and the search is limited to two-hours, CCR limit the scope of its request and identify records of primary interest.

67.     CCR made a timely appeal on September 14, 2010 to European Command's denial of CCR's request for a fee waiver and expedited processing. ("USEUCOM Appeal"). Additionally, CCR requested that an adequate and diligent effort be made by USEUCOM to properly designate information, disclose all responsive documents not properly subject to a FOIA exemption, and provide segregable information when necessary.

68.     In a letter dated November 5, 2010, the Department of Defense acknowledged prior receipt of CCR's timely appeal and notified CCR that the DOD would be unable to complete CCR's appeal within the statutory time requirement due to an "extremely heavy FIOA workload."

69.     As of the date of this pleading, and beyond the statutory deadline, Plaintiff has received no response from USEUCOM regarding its appeal, nor have any documents been released to CCR.

### Department of the Navy

70.     On June 30, 2010, CCR submitted, via first-class mail and e-mail, a written FOIA request to the Department of the Navy. ("Navy FOIA Request").

71.    In a letter dated September 9, 2010, the Navy notified CCR that it was "unable to process" and is therefore closing the Navy FOIA Request because it was "unable to identify any affiliation between the information [requested] and the Department of the Navy." ("Navy Response"). The Navy recommended that CCR submit its request directly to NATO headquarters and the Coast Guard. The Navy Response failed to inform CCR of its right to file an appeal.

72.    CCR made a timely appeal on November 8, 2010 to the Navy's determination that there is no affiliation between the information CCR seeks and the activities of the Navy. ("Navy Appeal"). CCR requested that the Department of the Navy conduct an adequate and reasonable search for the documents requested.

73.    Noting that the Navy had wholly failed in its obligations to search for responsive documents, CCR demonstrated in the Navy Appeal that there are reasonable grounds upon which to conclude that Navy has responsive records, such as the mission of the Navy includes protecting and defending U.S. allies to move freely on the oceans, and that Israel has been recognized as a "strong ally" and a "bilateral partner;" the U.S. Navy and the Israeli navy engage in joint exercise; information-sharing between the U.S. and Israel on Naval defense; and the robust presence maintained by the U.S. Navy in the Mediterranean.

74.    In the Navy Appeal, CCR also identified the Navy's error in recommending that CCR submit its Request to NATO Headquarters in Belgium, noting that NATO is a non-U.S. body that is not bound by the FOIA.

75.    The Navy acknowledged receipt of the appeal on November 9, 2010 and indicated that there may be some delay in resolving CCR's request.

76.     On December 10, 2010, the Navy's Second Response was issued, in which the Navy Appeal was granted based on a finding that the Navy did not conduct an adequate search. The Navy FOIA was remanded to the Deputy Chief of Naval Operations for Operations, Planning, and Strategy; the Deputy Chief of Naval Operations for Information Dominance; and the U.S. Sixth Fleet to perform an adequate search. The Navy Second Response informed CCR of its right to seek judicial review.

77.     As of the date of this pleading, and in excess of the statutory time-frame, no component of the Navy, including those identified in the Navy's Second Response, has issued any further responses relating to Request and no responsive documents have been released to CCR.

### Department of Homeland Security

78.     On June 30, 2010, CCR submitted, via first-class mail, a written FOIA request to the Department of Homeland Security. ("DHS FOIA").

79.     In a letter dated July 15, 2010, DHS requested that CCR resubmit its FOIA request with more specificity, stating that the DHS FOIA was too "limited" and suggesting that this was a matter under the purview of the Department of State.

80.     CCR resubmitted its FOIA request on August 13, 2010. ("DHS FOIA Resubmission"). In the DHS FOIA Resubmission, CCR stated that DHS was likely to have responsive records because of, *inter alia*, the scope of DHS's mandate, and the existence of an agreement between Israel and the United States that provides for the exchange of technologies, personnel and information, collaboration to develop technologies to counter "terrorist actions," facilitate "prompt exchange of information" and facilitate the dissemination of information "consistent with applicable national laws, regulations, policies and directives." *The Agreement between the United States of America And Israel on Cooperation in Science and Technology for Homeland*

*Security Matters,* dated 29 May 2008, *available at*: http://www.dhs.gov/xlibrary/assets/ agreement_us_israel_sciencetech_cooperation_2008-05-29.pdf. CCR identified the Office of Intelligence and Analysis as one subcomponent of DHS that is likely to have responsive records.

81.     DHS notified CCR on August 26, 2010 that it would refer CCR's request to the Office of Intelligence and Analysis. ("DHS Second Response"). In that Response, DHS denied CCR's request for expedited processing because a delay in processing "will not pose an imminent threat to the life or physical safety of an individual." DHS stated it would hold CCR's request for a fee waiver in abeyance, pending "the quantification of responsive records," but stated that if a fee waiver were denied, CCR would be considered as an educational requester.

82.     CCR received final responses stating that no responsive records had been located from two subcomponents of DHS in September and October 2010: the Office of Intelligence and Analysis and the Office of Policy.

83.     CCR submitted timely appeals to the Office of Intelligence and Analysis and the Office of Policy responses, on November 15, 2010 and December 13, 2010, challenging the adequacy of the searches conducted.

84.     CCR also received a final response, dated September 21, 2010, from the DHS Science and Technology Directorate. ("S&T Final Response"). The Science and Technology Directorate stated that its search produced 49 pages of documents, six of which it states were to be released in their entirety and 43 pages of which were partially redacted pursuant to 5 U.S.C. § 552 (b)(2)(high) and (b)(6) exemptions.[7] In fact, only 43 pages were received by CCR, of which 15 pages had redactions. Those documents which were released are available on CCR's web-site.

---

[7] It is recalled that the Supreme Court recently rejected the (b)(2)(high) exemption in *Milner v. Dep't of Navy*, 131 S. Ct. 1259 (2011).

85.    CCR appealed the S&T Final Response on November 22, 2010, appealing redactions under both (b)(2)(high) and (b)(6). ("DHS S&T Appeal"). CCR also appealed the adequacy of the search; S&T provided no information about the search terms used or any meaningful detail about the nature of the search, and CCR identified gaps in the documents released, which indicate that additional responsive records exist.

86.    CCR also received a final response, dated September 24, 2010, from the DHS Executive Secretariat. ("Executive Secretariat Final Response"). The Executive Secretariat stated that its search yielded one responsive document of four pages; it deemed three pages could be released in their entirety and one page was partially redacted pursuant to 5 U.S.C. § 552 (b)(2)(high) and (b)(6) exemptions. Additionally, the Executive Secretariat Final Response indicated that one document was being referred to the DHS Office of Policy for processing, and that the Request had been transferred to the Science and Technology Directorate for processing.

87.    CCR appealed the decision of the Executive Secretariat on November 23, 2010. ("Executive Secretariat Appeal Letter"). In this appeal, CCR contested the determination that exemptions (b)(2)(high) and (b)(6) were applicable to the document, and challenged the adequacy of the search conducted based on the information contained in the DHS FOIA Resubmission as well as based on the partial information released through the Executive Secretariat Final Response.

88.    In four separate letters issued on January 21, 2011, DHS acknowledged receipt of the four appeals. Each letter stated that in identical language that due to a "high number" of FOIA requests, there may be some delay in resolving CCR's appeals.

89.    As of this pleading, and in violation of statutory requirements, CCR has received no response to any of the appeals, including those challenging the adequacy of the searches

conducted and the application of exemptions (b)(2)(high) and (b)(6), and has received no information about the seemingly missing pages from the S&T Final Response or in reference to the referral of one document from the Executive Secretariat to the DHS Office of Policy.

### Department of Justice

90.     On June 30, 2010, CCR submitted, via first-class mail, a written FOIA request to the Department of Justice. ("DOJ FOIA").

91.     As of the date of this pleading, which is more than ten months since the initial FOIA request and well beyond the statutory deadline, the DOJ has not responded to, or acknowledged, the DOJ FOIA.

### Department of State

92.     On June 30, 2010, CCR submitted, via first-class mail, a FOIA request to the Department of State. ("DOS FOIA").

93.     In a letter dated August 24, 2010, DOS issued an interim response, denying CCR's request for a fee waiver, limitation of fees, and expedited processing. ("DOS Interim Response"). DOS placed CCR in the "other requesters" category.

94.     CCR made a timely appeal on September 29, 2010 to the DOS Interim Response, in which it challenged the denial of fee waiver, fee limitation and expedited processing. ("DOS Appeal").[8] In the DOS Appeal, CCR reiterated the information sought through the DOS Request is of public importance since no communication has been received about the preservation of evidence – particularly that evidence related to the death of U.S. citizen Furkan Doğan – and return of U.S. passengers' property months after the flotilla attack, and steps undertaken by DOS to ensure accountability, particularly for the death of Furkan Doğan.

---

[8]DOS Appeal available at:  http://www.ccrjustice.org/files/29.9.10%20FOIA%20DOS%20Appeal.pdf

95.    The DOS denied CCR's timely appeal in relation to expedited processing only on December 14, 2010. ("DOS Denial of Appeal"). The letter contained no information related to fees, and no information related to the search itself.

96.    It is recalled that in the DOD Final Response, DOD stated that it referred one document to DOS for review. No mention of that document is included in the DOS Denial of Appeal. Following a telephone inquiry by CCR to DOS regarding the status of that document in March 2011, CCR was informed that the document is still awaiting review.

97.    As of the date of this pleading, which is more than nine months since the initial FOIA request, the DOS has not processed CCR's FOIA request, in violation of the statutory deadline for processing.

## CAUSES OF ACTION

### First Cause of Action:
### Violation of FOIA for Failure to
### Timely Respond to Plaintiff's Requests Against All Defendants

98.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 97 as if repeated and incorporated herein.

99.    By failing to timely respond to Plaintiff's requests and timely appeals, Defendants have violated 5 U.S.C. § 552(a)(6)(A), and Defendants' internal regulations promulgated thereunder.

### Second Cause of Action:
### Defendants Improperly Denied Plaintiffs' Requests for Expedited Processing

100.   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 97 as if repeated and incorporated herein.

101.   Defendants have violated Plaintiff's right to expedited processing under 5 U.S.C. § 552(a)(6)(E) and Defendants' corresponding regulations.

Third Cause of Action:
Violation of FOIA for Failure to
Search for, Disclose and Release Records Responsive to Plaintiffs' Requests

102.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 97 as if repeated and incorporated herein.

103.    By failing to conduct a reasonable search for responsive records, disclose and release the requested records, Defendants have violated the public's right, advanced by the Plaintiff, to agency records under 5 U.S.C. §§ 552 (a)(3)(A) and 552(a)(3)(C) and Defendants' corresponding regulations.

Fourth Cause of Action:
Defendants Improperly Denied Plaintiffs' Requests for a Fee Waiver

104.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 97 as if repeated and incorporated herein.

105.    Defendants have violated Plaintiff's right to a fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii) and Defendants corresponding internal regulations regarding fee waivers.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.  Order Defendants to promptly complete full, adequate and timely searches for all documents relevant to this action and disclose the records;

2.  Order Defendants to engage in expedited processing for the aforementioned search and disclosure;

3.  Order Defendants to waive or severely limit all fees associated with disclosure of any documents which the Court may order released to Plaintiff in this action;

4.  Set a reasonable deadline for Defendants to produce requested records to Plaintiff;

5.  Award Plaintiff its costs and reasonable attorney's fees incurred in this action; and

6.  Grant such other and further relief as the Court may deem just and proper.


Respectfully Submitted,


*Katherine Gallagher*


Katherine Gallagher (KG-2222)
Maria C. LaHood (ML-1438)
Center for Constitutional Rights, Inc.
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6455
Fax: (212) 614-6499


Deena Hurwitz (*pro hac vice motion forthcoming*)
University of Virginia School of Law
International Human Rights Law Clinic*
580 Massie Road
Charlottesville, VA 22903
Tel: (434) 924-4776
Fax: (434) 924-7315

May 24, 2011


* Counsel wish to acknowledge the invaluable assistance of the following students from the University of Virginia School of Law International Human Rights Law Clinic: Carolyn Greco '11, Jessica Lee '12, Joel Sanderson '12 and Chen Song '12.